CRADDICK DEVELOPMENT, INC., an American Samoa Corp.,
EDGAR C. CRADDICK and DAVID CRADDICK,
ADMINISTRATORS OF THE ESTATE OF DOUGLAS C.
CRADDICK and ROBERT KERLEY, Appellants

v.

MAGDALENE VAIVAO CRADDICK
and DOES 1-20, inclusive, Appellees

High Court of American Samoa
Appellate Division

AP No. 14-95
CA No. 43-89

July 22, 1998

Before: WARD,[*] Acting Associate Justice, GOODWIN,[**] Acting Associate Justice, WALLACE,[***] Acting Associate Justice, SAGAPOLUTELE, Associate Judge, and TUAOLO, Associate Judge.

Counsel: For Appellants, William H. Reardon and Edward C. King
For Appellees, Togiola T.A. Tulafono
For American Samoa Government, Amicus Curiae, Gwen Tauiliili-Langkilde

OPINION

WALLACE, Acting Associate Justice.

## Introduction

In this latest episode in a long-running land ownership dispute, we consider whether the transfer of 20-year beneficial interests in land constitutes alienation, and if so, whether provisions of the American Samoa Code that prohibit alienation of land to non-Samoans violate constitutional rights. Because we conclude that such transfer does constitute alienation but that the alienation restriction passes strict scrutiny review, we affirm.

The relevant facts of this matter are not in dispute. Douglas Craddick (Craddick), now deceased, was a United States citizen married to Magdalene Vaivao Craddick (Magdalene), a full-blooded Samoan. In 1981, Craddick formed Craddick Development, Inc. (Craddick Development) with the intent of buying land, developing it for housing, and selling the developed land to American Samoans. The arrangement was that Craddick provided funds for the purchase of land in Magdalene's name, with the land held in two trusts, one for the benefit of Craddick Development, and the other for Craddick Development and another individual who was the trustee of an employee benefit plan. Magdalene was named as the trustee for both trusts. Both trusts were limited to 20-year periods.

---

[*] Honorable John L. Ward, II, Judge, District Court of American Samoa, serving by designation of the Secretary of the Interior.
[**] Honorable Alfred T. Goodwin, Senior Circuit Judge, United States Court of Appeal for the Ninth Circuit, serving by designation of the Secretary of the Interior.
[***] Honorable J. Clifford Wallace, Senior Circuit Judge, United States Court of Appeal for the Ninth Circuit, serving by designation of the Secretary of the Interior.

Craddick chose this arrangement because an earlier attempt to acquire land directly in joint ownership with Magdalene had failed, on the ground that Craddick's ownership of land, even individually owned land, would violate American Samoa restrictions on the alienation of land to non-Samoans. *See Craddick v. Territorial Registrar of American Samoan*, 1 A.S.R. 2d 10 (1980) ("*Craddick I*").

Craddick died on February 18, 1986, but the trusts continued in operation for two years. On February 12, 1988, Magdalene sought to cancel the trusts and claim clear title to the trust lands, prompting Craddick Development and the other individual beneficiary to file suit in the Trial Division of the High Court of American Samoa on April 21, 1989, seeking an accounting, damages, and injunctive relief from Magdalene. Magdalene counterclaimed, alleging that she owned the lands in question in fee simple and that the trusts were void.

The Trial Division held a three day trial in April 1994 and rendered its decision on June 27, 1995, holding the trusts to be void as against the non-alienation restriction.[1] The Court also denied a motion for a new trial. This appeal followed.

---

[1] Without encouragement of either party, the concurrence suggests that the trial court was without jurisdiction to make its decision based on land law in addition to trust law. The trusts involved Samoan land and the trial court was required to consider both areas of Samoan law. Thus, the action was properly filed in the Trial Division of the High Court because it involved trusts, and its disposition also required application of land law.

Both the Trial Division and the Land and Title Division are part of the High court. A.S.C.A. § 3.0207(a). Rather than have the case in both the Trial Division and the Land and Title division, the trial court rendered one opinion. As the concurrence admits, the same judges could decide the land issues. The trial court could have entered a perfunctory order reconstituting itself as both a Trial Division and a Land and Title division of the High Court, but what it did was the functional equivalent of such action. There was jurisdiction in the trial court to hear this case.

On appeal, the Appellate Division of the High Court was constituted into a five-judge bench, and, therefore, is competent to decide trust as well as land issues, since the Appellate division has jurisdiction to hear appeals of final orders from either the Trial Division or the Land and Titles Division. *See* A.S.C.A. § 3.0208 (c). The question raised as to whether the notes of two justices are enough to decide the appeal is not at issue here, as the two associate judges agreed with two of the acting associate justices, and, in any event, the issue is not jurisdiction.

## Discussion

Craddick Development makes two main arguments on appeal. First, it contends that the trusts in this case did not constitute "alienation" under A.S.C.A. § 37.0201(a). Second, it argues that if the trusts did constitute alienation, the restriction of land to those with less than one-half native blood violates the United States Constitution ("Constitution") and the Revised Constitution of American Samoa ("Revised Constitution").[2]

> It shall be the policy of the Government of American Samoa to protect persons of Samoan ancestry against alienation of their lands and the destruction of the Samoan way of life and language, contrary to their best interests. . . . No change in the law respecting the alienation or transfer of land or any interest therein, shall be effective unless the same be approved by two successive legislatures by a two-thirds vote of the entire membership of each house and by the Governor.

Rev. Const of Am. Samoa, Art. I, Sec. 3. Clearly, the framers of the Revised Constitution wanted to ensure that American Samoa's land remained in the hands of native Samoans.

### A. The Issue of Alienation

With this strong preference for native ownership in mind, we next turn to the relevant sections of the American Samoa Code. Section 37.0204(b) states:

> It is prohibited to alienate any lands except freehold lands to any person who has less than one-half native blood, and if a person has any nonnative blood whatever, it is prohibited to alienate any native lands to such person unless he was born in *American Samoa, is a descendant of a Samoan family, lives* with Samoans as a Samoan, lived in American Samoa for more than 5 years and has officially declared his intention of making American Samoa his home for life.

 This statute applies to all land in American Samoa except for "freehold lands," i.e., lands excluded from the general restriction on

---

[2] The concurrence would resolve this case not on these issued raised by the parties, but on the alleged statutory ground that Craddick Development failed to obtain the approval of the Governor to acquire an interest in land. This issue was never raised in the court below and has not been argued on appeal. To the extent it has validity, it has been waived.

23

alienation of land to a person with less than one-half native blood. *See* A.S.C.A. §§ 37.0201(b) and 37.0204(b). Thus, with the exception of freehold lands (not applicable here), a Samoan cannot "alienate" any Samoan lands to persons with less than full native blood except in special circumstances.

■ That leads to the question: what does "alienation" mean? The Code provides some guidance. According to section 37.0201(a), "'[a]lienation' means the sale, gift, exchange, or any other method of disposal of property." (Emphasis added.) This expansive definition of alienation has an exception in A.S.C.A. § 37.0205, which provides that "[t]his regulation [restricting the alienation of land] shall not apply" to a trust for mixed-race couples or descendants as beneficiaries.

Under the statutory interpretation maxim *expressio unius est exclusio alterius*, we agree with the Trial Division that the limited scope of the section 37.0205 exception implies that the term "alienation" under section 37.0201, and thus the restriction of section 37.0204(b), applies to all other forms of trusts. If the legislature wanted to exempt the trusts of the type involved in this case from the sweeping language of section 37.0201, it would have passed another exception like section 37.0205. This is especially true in light of Article I, section 3 of the Revised Constitution, which makes it clear that keeping American Samoa's land in the hands of native Samoans is of critical importance.

■ In this case, Magdalene held the trust for the benefit of Craddick Development. Obviously, as the beneficiary, Craddick Development owned an interest in the land, namely the interest in "all earnings, avails and proceeds of the Property." The beneficiary also had "(a) the right to direct the Trustee to convey or otherwise deal with the title . . .; (b) the right to manage and control the property; and (c) the sole right to receive the proceeds and avails from rental, sale, lease, mortgage or other disposition of the Property." Also, the Trustee only acted upon "written direction of the Beneficiary." Clearly, as beneficiary, Craddick Development owned these interest and rights in the land, and effectively controlled how the land would be used. This "ownership" by persons with non-native blood, we hold, violates section 37.0204(b), especially when viewed in light of the Revised Constitution's warnings against non-Samoan ownership (i.e. control) of the land.

Craddick Development argues that because the Code permits leases of 55 years, the trusts in this case are also acceptable. But like the exception under section 37.0205, the Samoan legislature expressly provided for leases under sections 37.0221-.0222. No such express legislative exception for the trusts in this case exists under the Code, and we should not manufacture one, especially in light of Article I, section 3 of the

Revised Constitution. Based on the foregoing statutory interpretation, we agree with the Trial division and hold that the trusts in this case constitute illegal alienation under Samoan law.

B. The Constitutionality of the Statutory Prohibitions

Because we hold that the trusts in this case are illegal under American Samoa statutory law, we next examine whether the relevant sections of the Code violate constitutional rights applicable in American Samoa.

Amicus American Samoa Government argues that A.S.C.A § 37.0204(b)'s restrictions on the right to own certain real property is not subject to the due process or equal protection guarantees of the Constitution. On the other hand, Craddick Development refers to the due process rights guaranteed by the Revised Constitution in Article I, section 2: "No person shall be deprived of life, liberty or property without due process of law, nor shall private property be taken for public use without just compensation." But this section must be read in conjunction with Article I, section 3, which restricts the ownership of Samoan lands to Samoan natives. Both provisions of the Revised Constitution must be given meaning.

The backdrop for this issue starts with the Treaty of Berlin, ratified by the United States Senate in 1890:

> In order that the native Samoans may keep their lands for cultivation by themselves and by their children after them, it is declared that all future alienation of lands in the Islands of Samoa to the citizens or subjects of any foreign country, whether by sale, mortgage or otherwise shall be prohibited.

*Craddick I*, 1 A.S.R.2d at 13. As amicus properly asserts, the subsequent deeds joining American Samoa to the United States implement this land restriction. Because of this background, amicus argues that the law governing American Samoa is different from that of the United States in dealing with alienation of land.

Recognizing that the Constitution nevertheless has some application to American Samoa as a United States Territory, and that fundamental rights will be enforced, amicus argues that land alienation is not such a right in American Samoa. Amicus not only relies on the Treaty of Berlin, the deeds of cessation, and the Revised Constitution, but argues persuasively from *Wabol v. Villacrusis*, 958 F.2d 1450 (9th Cir. 1990). There, the Ninth Circuit carefully examined land alienation restrictions imposed in the Northern Mariana Islands that had been challenged under the equal protection clause of the Constitution. Recognizing that the

Constitution exported protection of fundamental rights to the Territories, the court stated:

> "[F]undamental" within the territory clause are "'those . . . limitations in favor of personal rights' which are 'the basis of all free government.'" In the territorial context, the definition of a basic and integral freedom must narrow to incorporate the shared beliefs of diverse cultures. Thus, the asserted constitutional guarantee against discrimination in the acquisition of long-term interests in land applies only if this guarantee is fundamental in this international sense.

*Id.* at 1460 (citations omitted).

Thus, amicus argues that the equal protection clause, which does not appear in the Revised Constitution, is not imported as a fundamental right as to alienation of land restricted by the Treaty of Berlin, the deeds of cessation, and the Revised Constitution.

■ When this issue was before this court in *Craddick I*, we provided little analysis of this issue, and moved directly to whether such a classification, which we held was based on race, was necessary to protect a compelling state interest. *Craddick I*, 1 A.S.R. 2d at 11-12. We applied strict scrutiny review to the land restrictions. We then concluded that: "American Samoa has demonstrated a compelling state interest in preserving the lands of American Samoa for Samoans and in preserving the Fa`a Samoa, or Samoan culture. We find the prohibition against the alienation of land to non-Samoans to be necessary to the safeguarding of these interests." *Id.* at 12. *Craddick I* relied on the Treaty of Berlin, which expressly prohibited the alienation of land to non-Samoans, and the Revised Constitution for support.

We understand the argument by amicus on whether the Constitution's equal protection clause applies to this case and are not unsympathetic to it. However, we need not resolve that issue in this case, because even if the equal protection clause does apply to American Samoa, the land restrictions at issue would not violate that clause.

We agree with Magdalene and amicus that the vital interest in preserving Samoan culture has not diminished since the 1980 holding of this court. Preserving Samoan culture is of primary importance to American Samoa, and we cannot imagine anything that would so fundamentally alter the nature of Samoa than permitting non-full blooded Samoans to own and control land, whether native or individually held. Such an outcome would allow non-full blooded Samoans to decide the fate of American Samoan culture and identity, something abhorrent to the Treaty of Berlin

and the Revised Constitution. While strict scrutiny is a high hurdle to clear, the interest of American Samoa in retaining its national identity clears that hurdle. Thus, even if equal protection of the law applied to land alienation is a fundamental right guaranteed to citizens of American Samoa, we hold that the land restrictions are narrowly tailored to satisfy a compelling state interest. As we said in *Craddick I*: "It is this compelling state need to preserve an entire culture and way of life that permits the government of American Samoa to utilize a racial classification and still withstand the rigorous scrutiny of a watchful court." *Id.* at 12.

## C. Appellant's Policy Arguments

Finally, we dispose of Craddick Development's policy arguments. Craddick Development first argues that "this is not a case calling out for protection of American Samoans against overreaching land grabbing by an outsider."

We understand this first policy argument and are not unsympathetic to it, particularly in light of the Trial Division's finding that Magdalene assented to the trust arrangements and disavowed them when it redounded to her personal benefit and that she "appropriated trust funds for her personal use, badly abusing her position as trustee." However, the American Samoa Code does not contain an exception for cases that do not involve "overreaching land grabbing by an outsider." While Craddick Development's business plan might have ultimately benefited American Samoans, it is for the legislature, and not the courts, to amend the Code to allow for land transactions of the sort attempted in this case.

Second, Craddick Development argues that the land in question is individually-held land, which comprises only two percent of the land of American Samoa and is therefore not subject to the same protection as native land. While individually-owned land may comprise a small fraction of all American Samoan land, the alienation restriction plainly applies to all land except freehold land. Had the legislature intended to exempt individually owned land from the alienation restriction, it could have done so as well.

AFFIRMED.

---

# CONCURRING OPINION

WARD, Acting Associate Justice.

Although I concur in the result of the majority's opinion, I do not agree that this case presents a valid claim of race-based discrimination under the land alienation statutes. The jurisdiction of the trial court in this case was based on the areas of corporate, trust, and mortgage law. It is under this narrowly defined jurisdiction and these specific areas of law that I concur that the transactions at issue in this case were of no legal effect.

## I

Although the facts in this matter are not in dispute, neither are they in abundance. Appellant Craddick Development, Inc. is an American Samoan domestic corporation duly organized and licensed under the laws of this Territory. It later became sole beneficial owner of one of the 1985 land trusts and co-beneficial owner with the Anderson Employee Pension Fund of the second 1985 land trust. A motley assortment of earlier "Deeds of Trust" and coincidental land transfers were combined and rolled over into the two respective land trusts established in 1985. Both trusts involved individually owned lands.

Douglas Craddick is dead and his appellant estate has no discernable direct, present interest in either of these two 1985 land trusts. The legal status of appellant Anderson Employee's Pension Fund, Robert Kerley, Trustee, Honolulu, Hawaii, is nowhere evident in the record. As a legal entity ostensibly engaging in business for profit within the Territory, A.S.C.A. § 27.0202(a), for purposes of this discussion it will be presumed to be a foreign corporation: i.e., ". . . a corporation for profit organized under laws other than the laws of American Samoa." A.S.C.A. § 30.0101(d) (entitled "General Corporation Law").

I concur in the result of the majority's opinion only because the result reached in this case would have been substantially the same if it had been effectively argued by counsel before a trial court of clearly competent jurisdiction over the subject matter. This case began as a corporate trust case in the trial division of the High Court. At trial it was transformed into a land matter and decided, in no small part, by the trial division upon application of a single chapter of the Territory's land laws to the facts found at trial. Upon appeal, the majority of this Court further expanded this case to address the federal question of how to balance an individual's fundamental constitutional rights with the admittedly race-based land alienation restriction statutes appearing in Chapter 02, Title 37 of the American Samoa Code Annotated ("the Code"). This approach has resulted in jurisdictional inconsistencies and legal inaccuracies in both

28

the trial court's and the majority's opinions.

Exclusive trial court jurisdiction over "all controversies relating to land" is granted by statute to the Land and Titles Division of the High Court, A.S.C.A. § 3.0208(b)(2), not to the Trial Division of the High Court which heard and decided this case. Although the same justices and judges would sit and decide the case in either division at the trial court level, the consequences of jurisdiction become more apparent at the appellate division level. Under A.S.C.A. § 3.0221, the determination of a land case or controversy is made by a majority of the five member appellate panel. All other controversies (save for *matai* title cases) may be decided by any two of the justices serving on the appellate panel regardless of the vote of the remaining justice and the two Samoan judges. This statutory safeguard of local self-determination on culturally critical matters is forfeited unless the trial courts zealously guard their exclusive respective areas of subject matter jurisdiction.

The majority's footnote #1, on page 22 indicates that the Trial Division may grant itself jurisdiction to hear land controversies. The statutes indicate a contrary conclusion in that only the Land and Titles Division may exercise both land and collateral issues in a single controversy. The Trial Division's jurisdiction, and the consequential appellate review voting procedures are statutorily mandated and not subject to self ordered judicial expansion of prescribed subject matter jurisdiction. Regardless of the outcome of this particular case, we should diligently protect the cultural safeguards contemplated by the Legislature when so carefully constructing this process, rather than altering the process to protect a questionable product.

By relying solely upon that part of the trial division's opinion dealing with the land alienation restrictive statutes in affirming that court's decision, the majority of this Court embraces a jurisdictional paradox. It decides a land controversy appeal from a trial court which lacks subject matter jurisdiction over such a controversy. This dilemma can and should be avoided.

My concurrence in the result of the majority's opinion is predicated upon the belief that the Trial Division did have jurisdiction over the subject matter of this controversy because the legal issues presented were confined to the justiciable areas of corporate, trust, and mortgage law. This distinction, albeit of anorexic proportion, appears to present the only rational alternative to reversal based upon lack of jurisdiction.

The status of the parties and the legal devices selected to implement their land development schemes present dispositive legal issues short of reaching and constitutionally justifying the race-based land alienation

29

statutes of this Territory. Understandably, because such issues received little if any attention at the trial court level, the majority is reluctant to presently consider the application of local statutes other than those raised by counsel or utilized by the trial court. Yet to avoid the nagging jurisdictional issue, we appear compelled to do so under our powers of *de novo* review of applicable law.

Indeed, by failing to address the existence of applicable corporate land acquisition statutes to the incorporated appellants in this matter, the majority leaves unexplained its legal conclusion that corporations are "persons with non-native blood" and that any control over lands by corporations amounts to prohibited "non-Samoan ownership of the land". 2 A.S.R.3d at 24. Not to recognize specifically enacted corporate land acquisition statutes in a matter involving corporate parties appears violative of fundamental justice, especially in light of the severe forfeiture and penalty statutes which the trial court imposed upon these corporate appellants.

Article 1, § 3 of the Revised Constitution of American Samoa authorizes the legislature to enact legislation which "protects the land, customs, culture, and traditional Samoan family organization of persons of Samoan ancestry...." This "policy protective legislation," duly enacted under a super-majority successive-session constitutional requirement, is integral to the overall land regulatory scheme adopted by the locally elected and selected American Samoan members of the Legislature. The policy protective legislation is codified not only in A.S.C.A. tit. 37, ch. 02, but also in other chapters of the Code. In our *de novo* review of the law applicable to the facts of this case, it appears prudent to first inquire whether the Legislature has provided specific guidance upon the issues under consideration before we resort to case law of questionable application to the Territory of American Samoa.

Certainly with Appellant Craddick Development, Inc., and arguably with Appellant Anderson Employee's Pension Fund, we are dealing with corporate persons subject to the local statutes which create, regulate, or authorize the legitimate use of their corporate powers. And, with the trust instruments voluntarily selected by the parties to initially legitimize their land development scheme, we are dealing with a highly regulated, artificial form of land ownership which must meet strict statutory requirements of validity or suffer nullification as a legal consequence.

Corporate land acquisition powers within the Territory are granted and regulated under A.S.C.A. § 30.0131. Unlike the Northern Marianas approach to regulating corporate land acquisition powers by allowing only certain corporations owned and directed by a majority of persons of Northern Marianas Island descent to obtain title to, or long term

30

ownership interest in, certain lands, American Samoa has determined that for land acquisition purposes both foreign. and· domestic corporations within the Territory are "without race". A.S.C.A. § 30.0131.

Further, A.S.C.A. § 30.0131 prohibits the corporate acquisition of an interest in land unless the transaction is approved in writing by the Governor and recorded by the territorial registrar. Failure to comply with these two conditions precedent upon the valid exercise of corporate land acquisition powers nullifies the transaction under the statute's enforcement clause: "... and no such acquisition or transfer may be of any effect until so approved and recorded." *Id.*

In keeping with the trial division's subject matter jurisdiction, I would decide this matter within the confines of applicable corporate law and simply rule that the corporate appellants could not acquire any interest in land without first meeting the two conditions precedent upon the exercise of such corporate powers. · This would obviate the need to discuss and decide whether such transactions were "alienations" of land or even prohibited alienations ·of land under the race-based restrictions of A.S.C.A. § 37.0204. As the trial.court found at pages 9 and 10 of its decision, appellants failed to apply for approval of these land transactions from the Governor. That finding of fact, although determined in a slightly different context, is controlling for purposes of nullifying any of the ·land transactions entered into by the corporate appellants without the prior written approval of the Governor under A.S.C.A. § 30.0131. ..

The discretion granted to the Governor to regulate foreign and domestic corporation land acquisition powers within the Territory represents part of the Legislature's facially race-neutral corporation regulatory scheme. The second part of·this scheme is found under A.S.C.A. § 30.0 103, also specifically enacted under the super-majority, successive session requirement of the Revised Constitution. This statute provides corporations with the direct right of appeal to the U.S. Secretary of Interior concerning any adverse decision made by the Governor pursuant to the General Corporation Laws of the Territory. No comparable direct appeal to the Secretary is found in other land statutes applicable to natural individuals which require the Governor's prior approval. This appears to. buttress the inference that the Legislature sought to regulate corporate individuals under a separate race-neutral classification.

Because these statutes were not raised, argued or discussed below, we need not determine today whether these statutes specifically authorize corporations to acquire title to individually-owned lands in the Territory. All that is necessary to decide this case is to find that the corporate appellants lacked the capacity to lawfully engage in these transactions

31

until first complying with the conditions precedent upon the exercise of such corporate powers. As a consequence, these transactions were of no legal effect pursuant to A.S.C.A. § 30.0131.

The same rationale applies to the determination of the validity of the 1985 land trusts under local regulatory statutes. Both the trial court and the majority ably demonstrated that by prescribing the use of a particular type of land trust that could be utilized to convey beneficial land ownership to certain mixed marriage couples and the mixed race issue thereof, the Legislature had proscribed the use of all other forms of common law land trusts that might otherwise be formed to circumvent the protective legislative policy objectives necessary to preserve and protect the Samoan culture and land tenure system. The problem with their rationale is that the Legislature, under the successive session super majority constitutional requirement, enacted two land trust statutes, not just the mixed marriage-mixed race issue exception to the land alienation restrictive statutes. The second such land trust statute is found under A.S.C.A. § 28.1005, which reads in applicable part that a locally licensed bank may: "...acquire and hold title to land in trust for beneficial owners who are eligible under the laws of American Samoa to acquire and hold title to land,..."

Obviously, corporations that are "without race" cannot qualify as corporate beneficial owners of land under a statute restricted to mixed race marriages and offspring. Facially, however, A.S.C.A. § 28.1005 does not impose race, or blood levels of a particular race, upon the classification of persons eligible to use this type of land trust. What is specifically prescribed by this statute, however, is that any person desiring to legally acquire a valid beneficial ownership of land in trust must establish such a land trust with a locally licensed, federally regulated bank as trustee. No other entity, individual or corporate, is expressly empowered to acquire and hold title to land in trust under this statute.

The wisdom of the Legislature in prohibiting all persons other than federally regulated banks from serving in such a fiduciary capacity as trustee is amply demonstrated by the facts of this controversy. Both the trial court and the majority of this Court seem to agree that Appellee Magadaline Craddick failed to faithfully discharge her responsibilities as trustee of the two 1985 land trusts. What both opinions fail to declare, however, is that she was legally not qualified to acquire or hold title to land in trust for any qualified beneficial owner of such land trusts. That role has been specifically reserved for banks. Any purported conveyance of land to Magdaline as trustee for the 1985 land trusts must fail because she lacked the specifically prescribed, statutory authority as trustee to acquire any title to lands held in trust under A.S.C.A. § 28.1005. "Any

32

conveyance to one who is not capable of accepting title is void for want of a grantee capable of taking the estate conveyed." *Petesa Congregational Christian Church et al v. Tu`inanau,* 1 A.S.R.2d 22 (1980).

With respect to deciding the issue of whether the 1985 land trusts were valid, the dispositive issue is not blood or race, but the legal capacity of the trustee selected by appellants to acquire and hold title to lands in trust. In short, appellants Craddick Development, Inc. and the Anderson Employee Pension Fund never acquired any beneficial interest in the individually owned lands because the trustee they selected lacked the legal capacity to acquire title to such lands.

The issue of the legal capacity of the trustee of the 1985 land trusts is of singular importance to the appropriate disposition of this case. Under A.S.C.A. § 28.1005 any person who is qualified to acquire and hold title to land may be a beneficial owner of a land trust administered by locally licensed, federally regulated bank as trustee. Obviously the Legislature did not intend the race-based land alienation restrictions to fully apply to this statute. Full application would prevent the initial land title transfer because the trustee bank arguably does not possess the requisite 50% Samoan blood necessary to acquire and hold title to land. The statute would be rendered meaningless by such an interpretation. Nor does the statutory restriction that the trust's beneficial owner be qualified to acquire and hold title to land facially limit the application of this statute to persons of one-half or more Samoan blood. Arguably, corporations duly approved by the Governor or the Secretary of Interior could qualify. Apparently so would the mortgagees who foreclosed individually owned land mortgages and acquired short term title to such lands for the unexpired balance of the term of the mortgage plus ten years under A.S.C.A. § 37.1110. This policy protective legislation enacted after this Court decided *Craddick I,* specifically authorizes such mortgagees, regardless of race or blood, to acquire short term ownership of individually owned lands upon mortgage foreclosure, provided such lands are ultimately reconveyed to individuals possessing the requisite Samoan blood.

By deciding this controversy on the applicable corporate powers and land trust statutes specifically enacted by the Legislature to address these very issues, this Court could avoid the apparent legal inaccuracies contained in the majority's opinion. I am left with the distinct impression that the majority has concluded, without explanation, that any corporation is a "non-Samoan" and therefore statutorily prohibited from acquiring any interest in individually owned lands regardless of whether or not it has validly complied with the corporate land acquisition statutes. Although the application of such a holding to the parties to this controversy may

present justice of sorts, the larger application of this opinion to those domestic corporations organized under the laws of this Territory and owned and directed by persons of varying degrees of Samoan ancestry is alarming.

As I understand the trial court's and majority's opinion, every leasehold, easement, assignment of rents, license for use or any other interest in such lands conveyed to a corporation may now be voided at will by the owner of such individually owned lands. Not only may such conveyances apparently be voided as illegal "alienations" of "control" or "ownership" of individually owned land interests, but any improvements to such lands made by the occupying corporate entities would be forfeited to the owner of such lands under the penalty and forfeiture section (A.S.C.A. § 37.0230) of Chapter 02, Title 37 of the Code.

The forfeiture clause of this section applies only to that class of persons statutorily defined as "nonnatives," being: "... any person who is not a full-blooded Samoan" ASCA § 37.0201(e). This penalty section dates back to one of the earliest Naval Regulations promulgated to prohibit, at that time, any "native" (full-blooded Samoan as defined under A.S.C.A. § 37.0204(c)), from alienating land to any "nonnative." Gradually this clear cut distinction was statutorily altered to allow Samoan land owners to alienate their lands to "nonnatives" who possessed at least 3/4ths Samoan blood. Currently, the land alienation blood restriction is one-half or more Samoan blood.

The Legislature has enacted a separate penalty clause specifically applicable to corporate land transactions under A.S.C.A § 30.0131 which voids all transactions undertaken without the requisite approval of the Governor and proper recordation. If the Legislature had clearly intended the 90 year old penalty provision for violating the race-based land alienation laws of Chapter 02, Title 37, to apply to corporations who are without race, there would have been no reason to additionally create the separate, specific corporate penalty that nullifies non-conforming corporate land acquisition transactions. Nor is it plausible that the Legislature would authorize the regulated corporate acquisition of land or interests therein under Title 30 of the Code only to allow such transactions to be voided at will under Title 37 of the Code because such corporations are "non-Samoans."

The majority's opinion is made unclear by its repeated misuse of statutorily defined terms, such as "native" (i.e., a full-blooded Samoan) and "nonnative" (i.e., a person of less than full Samoan blood) and its use of undefined terms such as "Samoan," "Samoan lands" and "non-Samoan." This leads the majority into erroneous legal premises such as, "A Samoan cannot 'alienate' any Samoan lands to persons with less than

34

full native blood". 2 A.S.R.3d at 24. But under A.S.C.A. § 37.0204(b), a native or nonnative person owning individually owned lands is free to alienate such lands to any other nonnative who possesses the requisite *one-half or more* native blood. Even when dealing with the far more regulated land category of "native lands" (i.e., communally owned family lands under the control of the family's senior matai), the statutes provide that such lands may, with the prior approval of the Governor, A.S.C.A. § 37.0204(a) & (b), be alienated to certain qualified non-natives.

The majority's conclusion that the beneficial ownership of land in trust by appellants "violates Section 37.0204(b)" because it could have resulted in land ". . . ownership by persons with non-native blood. . ." at page 24 is equally unclear. The majority fails to explain how it apparently concluded that foreign and domestic corporations are legally determined to be "non-Samoan or "persons with non-native blood."

By statute corporate persons are without race and corporate land interest acquisition powers exercisable on a case by case basis at the sound discretion of the governor, subject to review by the Secretary of Interior. The majority's holding vitiates that corporate regulatory scheme, but supplies no alternative tool for deciding how to determine the "native blood" in corporate persons. Is it calculated by the Samoan ancestry levels of the corporate board of directors, the stockholders, or even the individuals who organize it? Clearly the Legislature opted to avoid these requisite blood measurement devices by declaring corporations without race. If the majority must set this approach aside, it appears incumbent upon them to explain how native blood is calculated when dealing with corporate land interest acquisitions.

Nor can I understand the statement on page 26 expressing the sentiment that: "... we cannot imagine anything that would so fundamentally alter the nature of Samoa . . ." as allowing such ". . . non-full blooded Samoans to own and control land. . ." Yet it appears this is precisely what was intended by the Legislature when enacting A.S.C.A. § 37.1110 which specifically authorizes such persons as I think the majority means by "non-full blooded Samoans" to acquire a short term "ownership (i.e., control)" of individually owned lands, regardless of race.

The generally adverse legal consequences of expanding and misapplying the defined terms associated with the land alienation laws of this Territory simply to decide this case far outweigh the need to do so in the manner chosen by the majority. This approach not only judicially alters the carefully enacted regulatory scheme of the Legislature but also stamps this case as a "controversy relating to land" which the trial court lacked jurisdiction to hear and decide. This case can, and should be, decided upon consideration of applicable policy protective legislation

specifically enacted to address the issues of law applicable to land trusts law and corporate land acquisition powers. The legal results would be essentially the same; the trusts are void and the interests in land attempted to be acquired by Appellants nullified. Jurisdiction would be preserved and both the majority of this Court, and the trial court when finally assessing damages, would be free to address the equities, rather than force application of a penalty and forfeiture section of law not clearly intended to apply to corporate land transactions otherwise voidable under the General Corporation Law of this Territory.

## II

Obviously I do not agree with the majority that appellants have demonstrated any injuries attributable to discriminatory race-based governmental actions. Appellants' injuries were self-inflicted, within areas of the law dealing with corporate powers and the legal capacities of land trust trustees, under statutes either facially race neutral or expressly so. Yet if we must address the issue of fundamental rights raised by appellants, it would appear we might do better than the majority's approach of simply posing, at page 26 that: "... even if the equal protection clause does apply to American Samoa, the land restrictions at issue would not violate that clause." The balance of page 26 of the majority's opinion similarly exhibits laudable and genuine sentiment for preserving the Samoan culture and way of life, but only by way of subjecting the Territory's race-based policy protective legislation to judicial strict scrutiny to decide if the Territory can demonstrate a compelling government interest in preserving its centuries old culture and communal land tenure system.

This controversy relates to interests in individually owned lands, not native lands (i.e., communally owned family lands under the control of the family's senior matai). Individually owned lands of the species at issue here, are of recent and judicial origin. Unlike traditional life upon native communal lands where the family member's entitlement to use of the property is conditioned upon that person's continuing obligation to render services to his family's senior matai, individually owned lands are outside of the direct control of the senior matai. A family member on communal land who refuses to contribute to family cultural rituals may quickly find himself evicted from such lands, but a person residing upon his or her own individually owned lands has clear title to such property superior against any other person. Individually owned lands are freely alienable, subject only to one-half or more Samoan blood requirement in the vendee. Such lands are also mortgageable, and subject to involuntary alienation upon mortgage foreclosure.

36

The calm assurances of the majority notwithstanding, I remain unpersuaded that some future Appellate Division panel or even a U.S. District Court in Washington, D.C., when applying strict scrutiny to the race-based land alienation restrictions applicable to individually owned lands, will always find the government's argument compelling that the only way to preserve a culture founded upon communally owned lands under the control of a senior matai, is to similarly restrict ownership of individually owned lands not subject to a senior matai's control, based upon race.

By treaty, the Deeds of Cession, and public laws duly enacted under the "needful Rules and Regulations" clause of Article IV, section 3 of the United States Constitution, the United States Congress has shielded the intertwined lands and culture of the Samoan people from the full application of federal law that might destroy the Fa`a Samoa. Not unlike the rights afforded Native Americans to preserve their tribal customs and lands, Congress has provided a similar opportunity of cultural self-determination to the people of this Territory. This concern was indicated even when Congress first dealt with the Territory's Deeds of Cession. Under 48 U.S.C. 1661(b), Congress specifically prohibited the application to the Territory of ". . . existing laws of the United States relative to public lands . . ." With this caveat, Congress then delegated its authority over the administration of the Territory to the President, who first used the Navy, then the Department of Interior, to directly administer the Territory while fostering the gradual development of a self-governing Territory.

The Revised Constitution of American Samoa was approved by the Secretary of Interior in the exercise of his powers over the Territory as delegated by Congress. The "policy protective legislation" section of the Revised Constitution, when first approved, reflected a delicate balancing of Samoan self-determination with federal oversight. The American Samoan Legislature was granted the conditioned authority to enact laws that its American Samoan members believed necessary to protect and preserve the Samoan culture and native lands that are so much a part of that culture and way of life. Balanced against these local powers of self determination, when the Revised Constitution was first adopted, was the clear retention of federal oversight powers exercised by the federally appointed Governor of the Territory through his legislation veto powers. Indeed, unless it is recognized that this federal oversight was part of the policy protective section when initially adopted, the clause in the first sentence of that section ". . . contrary to their best interests admits to no application. This clause represented the last vestige of the United States' direct power to dictate what was or was not in the Samoans' best interests, notwithstanding that two successive sessions of the local legislature by a 2/3rds or greater majority had declared what protective

37

laws they thought were necessary to preserve the Samoan culture and land tenure system.

When the federally appointed Governor was replaced by amendment to the Revised Constitution providing for a locally elected Governor, commencing in 1977, the Secretary of Interior effectively granted to the American Samoan Legislature and Governor, the unfettered power to decide for themselves what changes in the land alienation laws could or should be enacted. Congress completed this process in 1983 by enacting 48 USC 1662a, which prohibits any amendment to or modification of the Revised Constitution except by Act of Congress.

The United States initially decided that to protect the Samoan culture, the fundamental right of Samoans to alienate their lands must be abridged. At that time the Samoans lacked the political power to protect their culture and lands from foreign encroachment. Gradually the United States fostered the development of Samoan self-government and self-determination and slowly returned the exclusive power to preserve the Samoan culture, lands, and way of life to those persons best qualified to decide such matters, the Samoan people, their locally elected Governor and House of Representatives and their ranking matais who serve in their Senate. Although achieved by different means, Congress has provided, by needful rule or regulation, American Samoans with the rights to manage their lands and preserve their customs similar to those rights of Native Americans to control their tribal lands and customs.

Although I disagree that this Court need reach the fundamental rights issue raised by appellants in order to decide this case, if we must do so, we should first determine whether Congress has insulated the locally enacted policy protective legislation statutes from those sections of the United States Constitution whose full application might result in reimposing federal control over the Samoan culture, land tenure system and way of life. Fundamental rights unquestionably extend to the general laws of the Territory of American Samoa. Whether such rights apply with full force to areas of law reserved by Congress for the exclusive regulation by this unincorporated territory's locally elected Legislature and Governor is no longer settled law in this Territory.

The majority's Opinion at page 26 indicates little analysis was conducted on the issue of whether the equal protection clause (by virtue of the 5th Amendment), applied to the Territory by this Court in *Craddick I*. Yet, it appears *Craddick I* dealt entirely with that constitutional issue. The Court first declared unequivocally that ". . . the constitutional guarantees of due process and equal protection are fundamental rights which do apply in the Territory of American Samoa. . ." *Craddick I*, 1 A.S.R. 2d 10, 12 (App. Div. 1980). Secondly, that Court held the blood restricted

land alienation statute ". . . does create a classification based on race. . ." *Id.* Further, that Court held ". . . that statutes discriminating on the basis of race are subject to the strictest judicial scrutiny. . ." *Id.* The balance of pages 13 and 14 of the *Craddick I* decision is devoted to demonstrating a compelling state interest sufficient to justify the race based land alienation statute notwithstanding the Territorial application of the equal protection clause.

The opinion of the majority in the present matter appears to slightly retreat from the holding in *Craddick I* by prefacing its discussion with ". . . even if the equal protection clause does apply to American Samoa. . .". Nonetheless, the majority then proceeds with applying the compelling state interest test, a judicial statutory construction device reserved only for determining whether a particular government public policy objective can only be achieved at the expense of an individual's constitutional right to equal protection under the laws. Implicitly, the application of the compelling state interest test presupposes the determination that the equal protection clause applies to the Territory's policy protective statutes. There can be no other legal explanation for the majority's use of this test. As a consequence, this Court continues to subject the race-based policy protective legislation of this Territory to the disturbingly difficult burden of justification under the compelling government interest test.

Since at least 1917, race-base government restrictions upon an individual to freely alienate his or her lands have been viewed as unreasonable infringements upon recognized property and liberty interests protected by the due process clause of the 14th Amendment. *Buchanan v Warley*, 245 U.S. 60 (1917). For nearly 100 years both the executive branch and the Congress of the United States have clearly indicated that such 14th Amendment rights do not apply to the local laws applicable to the Samoan culture and land tenure system of this Territory. Congress has directly used and indirectly allowed the use of its Article IV powers to *carefully preserve for the Samoan people the exclusive right to determine* by local statute how their culture and land tenure system will be regulated. It appears overdue for the judicial branch to do likewise.

The majority's opinion is also disturbing in its apparent reliance upon such documents as the Treaty of Berlin to judicially evaluate the present exercise of exclusive powers to enact policy protective legislation by the Legislature and Governor. Although benignly used by the majority herein, I question whether this Court, or any other court, may set aside locally enacted policy protective legislation based upon its inconsistency with the 100 year old expressed interests of the colonial powers subject to that Treaty. For example, the Legislature has duly enacted A.S.C.A. § 37.1110 authorizing mortgagees other than persons of one-half or more Samoan blood to acquire short term title to mortgaged individually

39

owned lands upon foreclosure. Since the Treaty of Berlin contains a blanket prohibition against alienation of lands in the Islands of Samoa to foreign nationals by sale, mortgage or otherwise, it appears that under the majority's opinion at pages 25-27 this Court could judicially void the Territory's land mortgage statutes if it determined such statutes were "abhorrent to the Treaty of Berlin."

This approach seems to resurrect powers of the United States Government to decide whether a particular piece of policy protective legislation is valid based upon whether the Court views the statute as being contrary to the Samoans' best interests. It may prove ultimately correct, but it presently appears at variance with the historical development of self-government of this Territory and recently enacted Acts of Congress and the Territory's Legislature. In determining whether can only be achieved at the expense of an individual's constitutional right American Samoa is not destined for statehood. Within the currently evolving political status of the Territory, it appears more reflexive than reflective to judicially impose rigorous constitutional standards and tests to areas of law solely of local application which Congress appears to have insulated from such challenges. It appears more consistent with the apparent new order of things to at least consider the legal implications of 48 U.S.C. 1662a while addressing the appellants' fundamental rights arguments. It would certainly simplify our consideration of such issues to determine whether this act of Congress legally transformed the policy protective legislation section of the Revised Constitution into one of Congress's "needful Rules and Regulations respecting the Territory or other Property of the United States" pursuant to its inherent powers exercisable under Article IV, Section 3 of the United States Constitution. "If Congress has already decided that race-based policy protective legislation is a 'Needful Rule' for this unincorporated, no longer quite unorganized, territorial possession of the United States, our task is made much easier." directly used and which only allows the use of its Article can only be achieved for an alleged people the exclusive right to determine I concur with the result of the majority that the race-based policy protective legislation restricting the alienation of individually owned lands to persons of one-half or more native blood as enacted by the Legislature is constitutional. I do not agree that to so find, that this Court must apply the compelling governmental interest test to this policy protective legislation, or compare it for compliance with the Treaty of Berlin. Legislature and Governor. Although being by used by the unanimous herein I question whether this Court, or any other court, may set aside I concur solely because it appears Congress has resolved the fundamental rights issue in favor of the American Samoan people. Until and unless Congress amends or modifies the Revised Constitution, the exclusive power to determine the nature and scope of race-based policy protective legislation rests with the Legislature and Governor, subject to judicial

review based upon a reasonableness test. I would so hold.